

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER AND HONEY TORRETTI,  :          CIVIL ACTION
    as parents and natural guardians of  :
    Christopher J. Torretti, a minor, and  :
    in their own right  :          No. 06-3003
               :
       v.  :
               :
PAOLI MEMORIAL HOSPITAL, et al.  :

FILED

MICHAEL E. KUNZ, Clerk
By_____

## MEMORANDUM AND ORDER

**Juan R. Sánchez, J.**                                             **January 28, 2008**

Paoli Hospital[1] asks this Court to dismiss the sole federal claim brought by a brain-damaged infant and his parents. The Hospital argues liability under the the Emergency Medical Treatment and Active Labor Act (EMTALA)[2] attaches only if it knew Honey Torretti's condition was an emergency and directed her to Lankenau Hospital without stabilizing her. The Torrettis' testimony and expert reports present insufficient evidence of the Hospital's actual knowledge to overcome the Defendant's Motion for Summary Judgment. I will grant the motion and decline to exercise supplemental jurisdiction over the state law claims.

**FACTS**

Honey Torretti was 34 weeks pregnant with her second child late on a Friday when she called her obstetrician with a concern about pre-term labor and decreased fetal movement. Torretti did not think her condition was an emergency. Her doctor told her to keep a previously scheduled appointment at the Paoli Testing Center on Monday. Dr. Andrew Gerson testified Torretti was on

---

[1] Incorrectly characterized in the Complaint.

[2] 42 U.S.C. § 1395dd.

1

ENTERED

JAN 2___

CLERK OF COURT

the schedule for a "routine outpatient monitoring, of performance of a nonstress test in regard to her diabetes." Gerson Dep. 79:20-23.  Torretti had a medical history of recent admissions and treatment for pre-term labor, insulin dependent diabetes, excess amniotic fluid, and a baby large for his gestational age, 11 pounds at 34 weeks.

At the testing center, Torretti recounted her conversation with her obstetrician to Dr. Gerson. Torretti stated she was "very uncomfortable" on the way to Paoli and, once in the chair for the fetal non-stress test,

> the contractions started all over again, and it was to the point where I was grasping either the arm of the chair or both arms of the chair at once, and either almost grunting or to degree yelling, the pain was so bad. . . . they seemed to be worse than the preterm [contractions] that I had gone through a little less than a month prior.

Torretti Dep. 80:1-18.  Reviewing Torretti's fetal monitoring strips, Dr. Gerson testified he saw "possibly 16 contractions" in the 28 minutes of the non-stress test.  Gerson Dep. 48:5-8.

Torretti testified an attending nurse told her,

> I think you are going to have to go back down to Lankenau . . . the baby might come today.  And that was pretty much it.  There was no – no urgency, though, as far as I was concerned.  Debbie seemed pretty calm, and that's usually a pretty good indicator . . . I could usually read Debbie pretty well, I had known her since I had been pregnant with my first child.

Torretti Dep. 86:1-21.

Torretti called her husband to drive her to Lankenau.  Chris Torretti "wanted to make sure it wasn't an emergency.  He said, do we need an ambulance?  And I believe Dr. Gerson had replied and said, no, no, Chris had asked him not once about the ambulance, but twice."  Torretti Dep. 89:10-20.

Dr. Gerson testified he did not send Torretti in an ambulance because "I didn't think that an ambulance offered any extra benefit for Honey . . . I don't believe Honey was an acute emergency."

2

Gerson Dep. 56:4-7.

Torretti stated she did not then believe her condition was an emergency.  Torretti testified either the nurse or Dr. Gerson told her to go directly to Lankenau.  Dr. Gerson stated, "we expected her to go directly to the hospital."  Gerson Dep. 119: 7-8.  Torretti and her husband stopped by their home to drop off their daughter and pick up X-rays to take to Lankenau; the trip took about 45 minutes.

During the non-stress test at Paoli, Dr. Gerson testified, the fetal heart monitor showed "poor beat-to-beat variability.  That is suggestive of the possibility of brain injury, but we have no way of actually diagnosing brain injury during pregnancy."  Gerson Dep. at 6:14-18.

In response to the question, "[w]hat were the facts upon which you relied to tell Honey Torretti to go to Lankenau Hospital," Gerson listed three facts:

- "the fact that Honey had told me that she had had decreased fetal movement over the weekend prior to the day when I saw her;"
- that the beat-to-beat variability was decreased and decreased variability may just be a normal variant but combining the fact that Honey had suggested that the fetal movement had changed allowed me to look at that tracing and realize that I didn't want to monitor her for a prolonged period of time;" and,
- "there was a high likelihood that the baby would need to be monitored longer and, therefore, triaging her from an outpatient setting to an inpatient setting became the appropriate next step."

Gerson Dep. 18: 17-24, and 19: 1-18.

Asked why he did not keep Torretti at Paoli Hospital, Gerson testified Torretti's obstetricians delivered at Lankenau and

we had seen both gross body movements and limb movements, as well as the fluid around the baby allowed me to come to the conclusion that the baby had a biophysical profile score of at least 6, which is a profile score that allows one to draw a conclusion that delivery wasn't necessarily going to be imminent or need to be imminent and that it was appropriate for her to go to Lankenau.

3

Gerson Dep. 20:10-24.   Honey Torretti testified "[a]ll I remember is towards the end of the ultrasound, they said it had a score of two . . . I asked them what it meant, and they said it was low, it was a low score." Torretti Dep. 83:2-9.

Dr. Gerson testified he also wanted Torretti's blood sugar monitored because she had "artificially lower[ed] her blood sugar significantly . . . one of the factors that made me realize that Honey shouldn't stay in the testing unit very long and she needed to be in a place where she could be monitored for a longer period of time." Gerson Dep. at 21:13 to 22:2.   After 28 minutes, Dr. Gerson stopped the non-stress test and sent Torretti to Lankenau.

In response to the question, "[i]sn't it a fact that you stopped the monitoring and sent her to the hospital was because she was contracting and you knew that she was going to need to deliver that day?", Dr. Gerson stated, "[t]hat is completely incorrect." Gerson Dep. at 22: 13-20.

Dr. Gerson's written report stated:

> The patient was placed on the electronic fetal heart rate monitor.   The NONSTRESS TEST was nonreactive, using the criteria of two accelerations with fetal movement in twenty minutes.
>
> The AC is 423 – off the charts.
>
> The fetal heart rate is flat.  Honey has not felt any movement for two days. She has tried to have very low sugars to control her fluid.  She has had sugars less than 60.  Honey was sent to Lankenau for further monitoring.

Compl. at ¶ 25.

Torretti was admitted to Lankenau in pre-term labor and with "non reassuring [fetal heart tones]."  Lankenau performed a contraction stress test and left Torretti in a hallway to wait for a doctor before delivering Christopher.  Christopher was born with Apgar scores of zero at one minute

and five minutes,[3] a pH of 6.94,[4] and in need of resuscitation and ventilator support.  Christopher

suffered permanent mental and physical damage.

The Torrettis brought suit in this Court, asserting a federal question under EMTALA

EMTALA places three burdens on a hospital: appropriate medical screening, stabilizing treatment

of a known emergency condition, and restricting transfer until a patient is stabilized.[5]   Defendant

---

[3]Apgar scores are
> a practical method of evaluating the physical condition of a newborn infant shortly after delivery. The Apgar score is a number arrived at by scoring the heart rate, respiratory effort, muscle tone, skin color, and response to a catheter in the nostril. Each of these objective signs can receive 0, 1, or 2 points.  A perfect Apgar score of 10 means an infant is in the best possible condition. An infant with an Apgar score of 0-3 needs immediate resuscitation. The Apgar score is done routinely 60 seconds after the birth of the infant and then it is commonly repeated 5 minutes after birth.

.http://www.medterms.com/script/main/art.asp?articlekey=2302. (Last visited January 25, 2008).

[4]pH is measured in umbilical artery blood.  A result of less than 7.00 indicates "birth asphyxia or hypoxia to a degree of severity that might be associated with subsequent neurological dysfunction." http://www.obgyn.net/medical.asp?page=/english/ob/cord_blood_gases. (Last visited January 25, 2008).

[5]§ 1395dd. Examination and treatment for emergency medical conditions and women in labor
> (a) Medical screening requirement
>> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.
> (b) Necessary stabilizing treatment for emergency medical conditions and labor
>> (1) In general
>> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--
>>> (A) within the staff and facilities available at the

Paoli Hospital initially moved for dismissal of the EMTALA claim pursuant to Rule 12(b)(6).  I

denied that motion to allow the parties to conduct discovery because a hospital's knowledge of an

emergency condition is fact specific.  After discovery, Paoli Hospital now asks for summary

judgment on the EMTALA count.

## DISCUSSION

A motion for summary judgment will only be granted if there are no genuine issues of

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

----

> hospital, for such further medical examination and
> such treatment as may be required to stabilize the
> medical condition, or
> (B) for transfer of the individual to another medical
> facility in accordance with subsection (c) of this
> section. . . .
> (c) Restricting transfers until individual stabilized
>     (1) Rule
>     If an individual at a hospital has an emergency medical condition
> which has not been stabilized (within the meaning of subsection
> (e)(3)(B) of this section), the hospital may not transfer the individual
> unless–
>         (A)(i) the individual (or a legally responsible person
> acting on the individual's behalf) after being informed
> of the hospital's obligations under this section and of
> the risk of transfer, in writing requests transfer to
> another medical facility,
>         (ii) a physician (within the meaning of section
> 1395x(r)(1) of this title) has signed a certification that
> based upon the information available at the time of
> transfer, the medical benefits reasonably expected
> from the provision of appropriate medical treatment at
> another medical facility outweigh the increased risks
> to the individual and, in the case of labor, to the
> unborn child from effecting the transfer, or
>     (B) the transfer is an appropriate transfer (within the meaning of
> paragraph (2)) to that facility. . . .

42 U.S.C. § 1395dd

The moving party bears the burden of proving no genuine issue of material fact is in dispute and the court must review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stephens v. Kerrigan*, 122 F.3d 171, 176-77 (3d Cir. 1997).  The moving party must "bear the initial responsibility of informing the district court of the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted).  Once the moving party has carried its initial burden, the nonmoving party must then "come forward with specific facts showing there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (citing Fed. R. Civ. P. 56(e)). A motion for summary judgment will not be denied because of the mere existence of some evidence in support of the nonmoving party.  *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995). The nonmoving party must present sufficient evidence for a jury to reasonably find for it on that issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, a court does not resolve factual disputes or make credibility determinations and must view the facts and inferences in the light most favorable to the party opposing the motion. *Big Apple BMW, Inc. v. BMW of North Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied*, 507 U.S. 912 (1993).

EMTALA was enacted to prevent situations in which a hospital discharged a patient in labor "with instructions that she go to . . .  a facility approximately two hundred miles and four hours driving time away -- to deliver her baby," *Owens v. Nacogdoches County Hosp. Dist.*, 741 F. Supp. 1269, 1271 (D. Tex. 1990), or left a woman in labor "unattended to deliver her baby in unsterilized

surroundings," *Thompson v. St. Anne's Hospital*, 716 F. Supp. 8, 9 (D. Ill. 1989), or "refused to treat the patient because he discovered she was not a County-referred patient." *Hongsathavij v. Queen of Angels Etc. Medical Ctr.*, 62 Cal. App. 4th 1123, 1129 (1998).

Section 1395dd(c) generally restricts transfers of unstabilized patients, and § 1395dd(d) authorizes both civil fines and a private cause of action for violations of the statute.[6] The statute does not require proof of an improper motive. *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 251 (1999). Once it is determined a hospital violated EMTALA, the plaintiff need not prove negligence. The damages for a violation of EMTALA are the "damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(A).

To establish a violation of EMTALA's stabilization provision, Torretti must prove she had "an emergency medical condition, (2) the hospital actually knew of that condition, [and] (3) the patient was not stabilized before being transferred." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 883 (4th Cir. 1992).[7] If the hospital does not actually know of or diagnose the emergency medical condition, EMTALA duties do not arise. 42 U.S.C. § 1395dd(b)(1); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir.1990) ("[i]f the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition").

---

[6]The statute applies to any hospital facility, not just emergency rooms. *Lopez-Soto v. Haayek*, 175 F.3d 170, 177 (1st Cir. 1999). Conversely, admitting a patient as an inpatient from the emergency room is not a transfer for purposes of EMTALA. *Mazurkiewicz v. Doylestown Hospital*, 305 F. Supp. 2d 437, 447 (E.D. Pa. 2004).

[7]The Third Circuit has not addressed the extent of EMTALA liability.

EMTALA defines an "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in(i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part...." 42 U.S.C. § 1395dd(e)(1)(A).[8]   EMTALA defines the term "to stabilize"

---

[8]The relevant section of EMTALA is:

(e) Definitions

In this section:

(1) The term "emergency medical condition" means–

    (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

        (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

        (ii) serious impairment to bodily functions, or

        (iii) serious dysfunction of any bodily organ or part; or

    (B) with respect to a pregnant woman who is having contractions--

        (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or

        (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child. . . ..

(3)(A) The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

    (B) The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

(4) The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

42 U.S.C. § 1395dd.

as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. . . ." 42 U.S.C. § 1395dd(e)(3)(A). EMTALA defines "active labor" as labor at a time when there is inadequate time to effect safe transfer to another hospital prior to delivery, or a transfer may pose a threat [to] the health and safety of the patient or the unborn child. *Id.* (e)(2)(B)-(C), as amended. The statutory definition renders irrelevant any medical definition of active labor. *Burditt v. U.S. Dept. of Health and Human Services*, 934 F.2d 1362, 1369 (5th Cir. 1991). EMTALA defines "transfer" to include the discharge of a patient. 42 U.S.C. § 1395dd(e)(4).

An emergency room physician is only "required by EMTALA to screen and treat the patient for those conditions the physician perceives the patient to have." *Hunt ex rel. Hunt v. Lincoln County Memorial Hosp.*, 317 F.3d 891, 893 (8th Cir. 2003) (citation omitted). Even when an emergency room nurse classified a patient's condition as "urgent," a hospital could not be liable under EMTALA "merely because its medical staff failed to detect an emergency medical condition." *Bryant*, 289 F.3d at 1164.

The majority of circuit couts have decided a hospital cannot be held liable for conditions it does not detect. The Fourth Circuit affirmed dismissal of the EMTALA claim under Rule 12(b)(6), holding "[t]he Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." *Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139, 141 (4th Cir. 1996). The Ninth Circuit also found a hospital had no obligation "to stabilize [an] unapparent medical condition." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995). *See also Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.

10

1994) (holding plaintiff had failed "to provide evidence either that [the patient] was in an emergency medical condition when discharged or that [the hospital] knew of the emergency condition." ). The Fourth Circuit held when a patient "failed to present any evidence [the hospital] knew she had an emergency medical condition at the time of her transfer . . . , we need not inquire further into whether she was stabilized prior to her transfer." *Baber v. Hospital Corp. of America*, 977 F.2d 872, 875 (4th Cir. 1992).

The Sixth Circuit affirmed a grant of summary judgment for the defendant health care institution, but only because the plaintiff's "failure to stabilize" claim was based solely on a negative outcome; there was no evidence indicating that the patient was unstable at discharge. *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990); *see also Morgan v. North Mississippi Medical Center, Inc.*, 458 F. Supp.2d 1341, 1342 (S.D. Ala. 2006) (finding failure "to detect or discern the existence or severity of an emergency medical condition are not generally redressable under EMTALA, but are instead relegated to the state-law province of medical malpractice law."); *Stringfellow v. Oakwood Hosp. and Medical Center*, 409 F. Supp. 2d 866, 868 (E.D.Mich. 2005) (granting summary judgment to the hospital when the plaintiff failed to offer evidence the hospital had knowledge of the aortic dissection which killed the patient complaining of chest pains after he was discharged with an anti-anxiety medication).

EMTALA liability "does not hinge on the result of the plaintiff's condition after the release or transfer, but rather on whether the hospital would have considered another patient in the same condition as unstable that would not warrant his or her release or transfer." *Sanchez Rivera v. Doctors Center Hosp., Inc.*, 247 F. Supp. 2d 90, 98 (D. Puerto Rico 2003). A hospital that does not determine that there is an emergency medical condition has no duty under EMTALA to perform a

11

further examination and stabilize the medical condition. *Brenord v. Catholic Medical Center of Brooklyn and Queens, Inc.* 133 F. Supp. 2d 179, 185 (E.D.N.Y. 2001) (granting summary judgment to a hospital which missed a miscarriage after the patient's water broke). A patient who died of pneumonia after two emergency room visits in which she was treated for bronchitis could not make out a claim under EMTALA because she cold not prove actual knowledge. *Tank v. Chronister*, 941 F. Supp. 969, 971 (D. Kan. 1996); *see also Green v. Reddy*, 918 F. Supp. 329, 335 (D. Kan. 1996) ("stabilization or transfer" provisions of EMTALA require actual knowledge of emergency medical condition).

A plaintiff's expert who opines a doctor should have recognized the emergency condition is not enough to confer liability under EMTALA. The Fourth Circuit held an expert's opinion may support a medical malpractice claim, but was insufficient for EMTALA in a case in which an emergency room physician discharged a bi-polar patient who then committed suicide. *Pettyjohn v. Mission-St. Joseph's Health System, Inc.*, 21 Fed.Appx. 193, 194, 2001 WL 1334185, **1 (4th Cir. 2001). The Tenth Circuit similarly held "[i]t is not enough to claim the Hospital 'should have known' of her condition, plaintiff was required to raise a triable issue regarding the Hospital's actual knowledge of her unstabilized condition." *Bloomer v. Norman Regional Hosp.*, 2000 WL 963336, *1 (10th Cir. July 12, 2000). See also *Slabik v. Sorrentino*, 891 F. Supp. 235 (E.D. Pa. 1995) (holding no EMTALA cause of action when a diagnosis of malingering to receive drugs missed a rupturing appendix).

The question is not whether the hospital should have detected an emergency medical condition, but whether the hospital had actual knowledge of the emergency. A reasonableness standard does not apply. *Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1166 (9th Cir.

12

2002). In *Bryant*, the court held an expert's opinion a doctor should have known the patient had a lung abscess was relevant to a malpractice claim, but not to an EMTALA claim. *Id.* EMTALA "takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect . . . . The Act does not hold hospitals accountable for failing to stabilize conditions . . . of which they should have been aware. EMTALA would otherwise become coextensive with malpractice claims for negligent treatment." *Vickers*, 78 F.3d at 145 (citations omitted) (holding a hospital which stitched a head wound and discharged the patient, missing the cerebral damage which killed him six days later cannot be held responsible under EMTALA). Citing the "lamentable outcome" for the decedent, the *Vickers* court stressed "both the diagnosis and treatment may form the basis of state malpractice claims. Failure to stabilize claims under EMTALA are different, however, as Congress deliberately left the establishment of malpractice liability to state law." *Vickers*, 78 F.3d at 145 (citation omitted).

EMTALA does not establish a federal medical malpractice cause of action. *See Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir.2002) (EMTALA "was not intended to be a federal malpractice statute"); *Marshall v. East Carroll Parish Hosp. Service Dist.*, 134 F.3d 319, 323 (5th Cir.1998) ("a treating physician's failure to appreciate the extent of the patient's injury or illness, as well as a subsequent failure to order an additional diagnostic procedure, may constitute negligence or malpractice, but cannot support an EMTALA claim").

A precondition to EMTALA's duty to stabilize is a doctor's actual knowledge of the emergency condition. *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776 (6th Cir.

2003), *rev'd on other grounds*, 525 U.S. 249 (1999).[9]   When a hospital treats the only emergency condition diagnosed, it cannot be faulted under EMTALA for failing to treat an undiagnosed emergency condition.   *Jackson v. East Bay Hospital*, 246 F.3d 1248, 1257 (9th Cir.2001); *Stringfellow v. Oakwood Hosp. and Medical Center*, 409 F. Supp. 2d 866, 871 (E.D. Mich.2005) (reasoning "[i]f the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition.").

The Torrettis have proffered an expert report in response to Paoli Hospital's Motion for Summary Judgment.  Steven a.. Klein, M.D., examined Torretti's records and found a pattern of contractions "consistent with labor." Pl.'s Resp. Ex. A at 1. He opined "the fetal status was not normal and not stable." *Id.* at 2.  Dr. Klein concluded "[t]he average prudent perinatal physician would send this patient to the nearest appropriate Obstetrical care facility to evaluate for possible urgent delivery. . . .  the fetus was not in a stable condition and was not suitable for transfer to another hospital.  *Id.*  Dr. Klein finished by stating he "holds these opinions to within a reasonable degree of medical certainty. . ." *Id.*  Plaintiffs' second expert, David Powers M.D., would testify to negligence and causation, neither of which are relevant to the EMTALA claim.

This Court does not need to decide the thorny medical question of whether Honey Torretti's condition was actually a medical emergency.  The Torrettis argue the question of Dr. Gerson's

---

[9]In a footnote in *Roberts*, the Supreme Court expressed "no opinion as to the factual correctness or legal dispositiveness of" a claim actual knowledge is required to find liability. *Roberts*, 525 U.S. at 254 n.2. The Court left the resolution to the court below. *Id.* Although the Supreme Court has not expressly concluded that actual knowledge of the patient's condition is a prerequisite to liability under EMTALA, the collection of case law in the courts below requires it. *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 883 (4th Cir. 1992); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268-69 (6th Cir. 1990).

knowledge is a fact for the jury to find.  Before the question gets to the jury, however, I must determine whether, viewing all of the evidence in the light most favorable to the Torrettis,[10] they have offered sufficient evidence Dr. Gerson knew Torretti presented a medical emergency to sustain their claim under EMTALA.

EMTALA cases are fact specific: what did the hospital – through its staff – know and when did it know it.  I must examine Dr. Gerson's knowledge of Torretti's condition in relation to the cases in which EMTALA liability has been found for a failure to stabilize and in relation to the cases in which no liability has been found for failure to stabilize.[11]

---

[10]A plaintiff creates a genuine issue of material fact sufficient to avoid summary judgment when he testifies he complained of chest pains and calls his condition an emergency.  *Cruz-Queipo v. Hospital Espanol Auxilio Mutuo de Puerto Rico*, 417 F.3d 67, 69 (1st Cir. 2005) (reasoning "we must credit Cruz's assertion that he did, in fact, report such pain, and, drawing all reasonable inferences in Cruz's favor, we must assume that the emergency room doctors were aware of the chest pain.").

[11]I did not consider cases in which a failure to screen was alleged because the Torrettis' assert their claim as one of failure to stabilize before transfer.  Several courts have found defendant hospitals are required under EMTALA to screen appropriately before they can assert a defense of lack of knowledge of the emergency condition.  *See Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir.1991) (finding a doctor who failed to note a car accident victim's head abrasion, injury to the hand, and did not discuss any of the patient's other prior medical conditions potentially liable under EMTALA).  The Ninth Circuit held an "examination does not have to be 'medically adequate' to satisfy EMTALA's requirements" in a case granting summary judgment to a hospital which transferred a psychiatric patient from the emergency room to a mental health facility where he died. *Jackson v. East Bay Hospital*, 246 F.3d 1248, 1256 (9th Cir.2001).  An affidavit "might be sufficient to survive a summary judgment motion in a medical malpractice case, it is clearly insufficient to survive a motion for summary judgment in an EMTALA case . . . " *Richmond v. Community Hosp. of Roanoke Valley* 885 F. Supp. 875, 877 (W.D. Va. 1995) (citations omitted) (holding no EMTALA liability because no one detected that plaintiff suffered from an emergency medical condition).  The First Circuit found plaintiffs had not offered evidence "sufficient to support a finding . . . [of] an emergency medical condition" and  held "this court need not reach any questions about the nature of stabilization if we determine that the predicates to stabilization have not been satisfied." *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 80 (1st Cir. 2000). *See also James v. Sunrise Hosp.*, 86 F.3d 885, 886 (9th Cir. 1996) (holding "there is no liability under subsection (c) unless there has been a determination under subsection (b)").

When the evidence of the emergency is apparent to the naked eye, EMTALA liability attaches, such the case in which a hospital transferred a car accident victim, a 33-year-old man weighing approximately 600 pounds, who fractured his left leg during a rollover car accident, without stabilizing a comminuted left femur fracture, a break that causes the bone to pierce the skin. Twenty-one minutes into the transfer by ambulance, the patient died from blood loss. *Smith v. Botsford General Hosp.*, 419 F.3d 513, 515 (6th Cir. 2005).

When a plaintiff produces evidence of a difference of opinion within the hospital, she may avoid summary judgment because the knowledge of any staff member is attributed to the hospital under EMTALA. *See Thomas v. Christ Hosp. and Medical Center*, 328 F.3d 890, 896 (7th Cir. 2003) (holding difference of opinion between a social worker and the doctor who discharged a suicidal patient is sufficient to overcome summary judgment); *Roberts ex rel. Johnson*, 325 F.3d at 778 (holding evidence from nurses of elevated white blood-cell count and temperature, cloudy urine, and expiratory wheezes before transfer was sufficient to present the case to a jury). A nurse's affidavit a patient was not in the cardiac unit because he did not have insurance avoided summary judgment when the patient died during an airlift to another hospital. *Brodersen v. Sioux Valley Memorial Hosp.*, 902 F. Supp. 931, 936 (N.D. Iowa 1995). Summary judgment was denied when a nurse described the patient's condition as "code blue" before an emergency room doctor sent him home, despite the doctor's affidavit he saw no emergency. *Griffith v. Mt. Carmel Medical Center*, 831 F. Supp. 1532, 1535 (D. Kansas 1993).

The Fifth Circuit remanded a case to give the parents an opportunity to produce evidence EMTALA was implicated when doctors failed to stabilize their child in two emergency room visits with seizures of unknown etiology. The child "was left in a persistent vegetative state by from viral

16

encephalitis . . . about as damaged as a human being can be and still be alive." *Battle ex rel. Battle v. Memorial Hosp. at Gulfport*, 228 F.3d 544, 548 (5th Cir. 2000).

Another patient made two trips to the emergency room complaining of pain in her left hip, her lower left abdomen, in her back running down her leg, and reporting that she was unable to walk, was shaking, and had severe chills before the doctors diagnosed septic shock and admitted her to the intensive care unit of the hospital. The patient remained in intensive care for more than four months during which time she was on life support equipment, had both legs amputated below the knee, lost sight in one eye, and experienced severe and permanent lung damage. The Court of Appeals affirmed a $5 million jury verdict in favor of the plaintiff. *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 853 (4th Cir. 1994). *See also Millan v. Hosp. San Pablo*, 389 F. Supp. 2d 224, 234 (D. Puerto Rico 2005) (denying summary judgment on EMTALA claim for failure to stabilize Joseph Bermudez Millan, who was three and a half months old at the time of his death, reasoning "the child's appearance accompanied by a normal chest X-ray at the time of discharge from San Pablo is meager evidence of baby Joseph's stability at time of discharge").

Also surviving summary judgment was a case in an emergency room delayed for more than an hour treating a patient with a history of diabetes mellitus, arterial hypertension, bronchial asthma, and psychiatric conditions. The patient presented with dizziness, vomiting, and headache and was discharged. When the patient and his wife objected to his discharge, the doctor became irritated and replied to her: "Lady, are you a moron? Don't you understand? I am the doctor and I say when the patient should leave." The patient died a few days later. *Marrero v. Hospital Hermanos Melendez, Inc.*, 253 F. Supp. 2d 179, 183-84 (D. Puerto Rico 2003).

A patient in labor presents a closer question under EMTALA. Summary judgment was

17

denied to a hospital which transferred a patient who arrived by ambulance, was eight months pregnant, bleeding vaginally, and whose water had broken. During the transfer, the vaginal bleeding continued and her pain increased. The baby was stillborn. The court found "[t]here is substantial evidence in the record [the patient] was having contractions while at the Hospital, so she could not have been 'stabilized' for purposes of the EMTALA . . ." *Heimlicher v. Steele*, 2007 WL 2384374, *1  (N.D. Iowa, August 17, 2007)

In contrast to *Heimlicher*, the Tenth Circuit found no EMTALA liability when "[t]here is no dispute as to the hospital's lack of knowledge. As such, no material facts are in dispute." *Urban By and Through Urban v. King*, 43 F.3d 523, 524-25 (10th Cir. 1994). In *Urban*, the patient in a high-risk pregnancy went to the obstetrics department for a stress test which was non-reactive, showing no fetal movement. The fetal heart tones and the patient's vital signs were normal. The patient was discharged and told to return the next day for another stress test. During the repeat stress test a biophysical profile revealed no movement or breathing in either fetus. A Caesarian section was performed that day. One baby was delivered stillborn and the other was born with brain damage. *Id.* at 525. The Tenth Circuit found "the plaintiff must prove the hospital had actual knowledge of the individual's unstabilized emergency medical condition to succeed with a claim under § 1395dd(c)." *Id.* at 526. In a screening case, the 11th Circuit found no EMTALA liability because the patient failed to present evidence of a genuine issue of material fact, which would have precluded summary judgment in the death of her triplets. *Nolen v. Boca Raton Community Hosp., Inc.*, 373 F.3d 1151, 1153 (11th Cir. 2004).

In this case, Torretti did not present herself to the Hospital as an emergency patient; she appeared for a previously scheduled appointment at the anticipated time. Despite her testimony that

18

the contractions made her grip the arms of the chair, Torretti did not describe her condition as an emergency during the stress test and testified neither the nurse nor Dr. Gerson exhibited any indication her condition was an emergency.

Nothing in Dr. Klein's expert report suggests Dr. Gerson knew Torretti and her baby were in an emergency condition. To the contrary, Dr. Klein's opinion states what Dr. Gerson should have done. Dr. Klein faults Dr. Gerson for making "no further attempt to fully evaluate the fetus with a biophysical profile or umbilical artery doppler." Pl.'s Resp. Ex. A at 2. The test under EMTALA is what the doctor knew, not what he should have known. Dr. Klein opines the delay in delivery "would have contributed to the subsequent newborn complications which ultimately resulted in neurologic complications." *Id.*

The difficulty with Dr. Klein's analysis for purposes of establishing liability under EMTALA is the record shows a patient presenting not as an emergency but for a routine appointment. During the appointment, Dr. Gerson noted no change in Torretti's condition demanding emergency attention. In the one factual dispute between Torretti and Dr. Gerson, the number attached to the baby's biophysical profile, Torretti's testimony was uncertain enough that it does not create a "genuine issue of material fact" sufficient to present this case to a jury. Even taking Torretti's number as true, that Christopher register two on a biophysical scale, the Torrettis have not produced any evidence of the meaning of that number. The Torrettis' expert faulted Dr. Gerson for failing to "fully evaluate the fetus with a biophysical profile." *Id.* In addressing the EMTALA claim, Dr. Klein stated "Torretti was demonstrating a labor pattern . . .the fetus was not in a stable condition and was not suitable for transfer to another hospital." *Id.* Dr. Klein does not address what Dr. Gerson actually knew at the time, only what Dr. Gerson should have known. Dr. Klein's opinion might be sufficient to sustain

19

a medical malpractice claim but it is not enough to support a claim under EMTALA.

The cases which have survived motions for summary judgment involve a greater quantum of disputed facts than exist in the case before me. Torretti did not present symptoms as obvious as a bone protruding through skin, *Smith*, or vaginal bleeding. *Heimlicher*. Torretti has not produced testimony or affidavits suggesting a difference of opinion among the medical professionals as in *Thomas* or *Roberts*. Nor has Torretti documented a denial of treatment despite repeated visits to an emergency room as in *Battle* or *Power*.

Without the EMTALA claim this Court is without jurisdiction because the parties are not diverse. I decline to exercise supplemental jurisdiction over the state law claims. When a federal claim is dismissed before trial, this Court "must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (citing *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)). The parties have conducted discovery so transfer to a state court will not delay resolution of the case. Pursuant to 28 U.S.C. §1367(d), the statute of limitation for the state law claims is tolled for an additional 30 days.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER AND HONEY TORRETTI,  :        CIVIL ACTION
    as parents and natural guardians of   :
    Christopher J. Torretti, a minor, and  :
    in their own right   :        No. 06-3003
                          :
         v.   :

PAOLI MEMORIAL HOSPITAL et al.   :

## ORDER

And now this 28th day of January, 2008, Defendant Paoli memorial Hospital's Motion for Partial Summary Judgment (Document 45) on Count I of the Complaint is GRANTED and judgment is ENTERED in favor of Defendant Paoli Memorial Hospital and against Plaintiffs on Count I. Defendants' Motions for partial Summary Judgment on Count V (Documents 44 and 46) are DISMISSED as moot in light of Plaintiffs' Stipulation of Dismissal of Count V (Document 53).  I decline to exercise supplemental jurisdiction over the remaining state law claims.  28 U.S.C. § 1367(c)(3).  The period of limitations shall be tolled for a period of 30 days after the date of this Order.  28 U.S.C. § 1367(d)   The Clerk shall mark the above-captioned case as CLOSED.

BY THE COURT:

_Juan R. Sánchez_                     J.